### LINDSTEADT *v.* LOUIS SANDS SALT & LUMBER CO.

1. MASTER AND SERVANT—CAUSE OF DEATH—REVIEW.

In a proceeding for compensation in favor of the widow of a workingman who was found dead under a pile of refuse from the mill of defendant, evidence reviewed, and *held*, to support the finding of the Industrial Accident Board, that decedent came to his death by reason of an accident arising out of and in the course of his employment.[1]

2. SAME—EVIDENCE.

The burden of proving the essential elements in such a proceeding rests on the claimant, but the findings of fact of the board are, by statute, made conclusive on the court, which, if there is competent evidence to support the findings, will not undertake to weigh it. 2 Comp. Laws 1915, § 5465.

3. SAME—WAGES—AVERAGE EARNINGS—AWARD.

The award should not have exceeded the average earn-

---

[1] As to workmen's compensation acts, see note to L. R. A. 1916A, 22.

ings per week during the year preceding his death, under the provisions of section 11, Act No. 10, Extra Session 1912 (2 Comp. Laws 1915, § 5441).

Certiorari to the Industrial Accident Board. Submitted January 4, 1916. (Docket No. 1.) Decided March 30, 1916.

Mary Lindsteadt presented a claim for compensation against the Louis Sands Salt & Lumber Company for the death of her husband in defendant's employ. From an order awarding compensation respondent brings certiorari. Affirmed, but remanded for modification of amount awarded.

*Peter T. Glassmire,* for appellant.

*Howard L. Campbell,* for appellee.

BROOKE, J. In this proceeding defendant reviews the determination of the Industrial Accident Board, by the terms of which it is compelled to pay to the applicant the sum of $6.17 per week for a period of 300 weeks, as compensation for the death of one William Lindsteadt, husband of the applicant. The findings of fact and law made by the Industrial Accident Board follow:

"(1) That the defendant, the Louis Sands Salt & Lumber Company, is a corporation with its principal offices and place of business in the city of Manistee, Mich., and is and has been for a number of years engaged in the manufacture of lumber and salt at its mill and plant in Manistee, and was so engaged in carrying on said business on and before the 9th day of May, 1914.

"(2) That a large part of the sawdust from the logs sawed in defendant's mill, as well as certain other refuse from said logs, was used by said defendant as fuel under its boilers in its fire room for the purpose of generating steam for operating said plant, and for this purpose said refuse was passed through a grind-

ing hog at or near said sawmill, and said refuse, after being so ground, was carried from said hog by a conveyor to a building nearby, designated and called a hog or fuel house, into which said refuse was dropped to the floor beneath, a distance of about 53 feet from said conveyor, which extended inside of said hog house about 6 feet and at the top of the same and near to the west wall thereof, said hog house being of wrought-iron construction, and 30 feet wide and 50 feet long, and oval in shape.

"(3) That said refuse carried into said hog house by said conveyor was removed therefrom to the fire room for use under said boilers by means of another conveyor underneath the floor of said hog house, by which said refuse was carried to said fire room; that said refuse coming into said hog house through said conveyor from the mill consisted of about one-third sawdust, the rest of said material being small pieces of wood and shavings as it was ground in said hog; that as said refuse fell from the conveyor at the top of said fuel house to the floor thereof it assumed a cone shape, piling up against the west wall of said building and slanting toward the opposite wall thereof near the entrance to the same; that over the conveyor underneath the floor of said fuel house, which said conveyor extended along the east side or wall thereof, were several loose planks about 3 feet long and 10 inches wide, which were moved forward in such a way as to permit the refuse in said building to fall by its own weight through the spaces between said planks and into the conveyor underneath.

"(4) That said refuse was usually damp, having come from logs which were taken out of the lake day by day and into the mill for sawing; that as said loose planks over said conveyor were removed, the said refuse fell into said conveyor by its own weight, thereby leaving a pile or bank of said refuse on each side of said conveyor which, as the volume of said refuse in said building decreased, would be scraped or raked into said conveyor by a man employed for that purpose; that said refuse was conveyed into said building during the daytime while said sawmill was in operation and was carried out of said building to the fire room during the night by the night operations; that

is, from 6 o'clock in the evening until 6 o'clock the next morning; that no refuse was coming into said fuel house at night.

"(5) That the entrance to said fuel house is shown on the map or diagram which was marked respondent's Exhibit A, and received in evidence upon the hearing of said cause before the board of arbitration, and it was conceded by counsel that said plat or diagram was substantially correct as to measurements and as to such other things as it pretended to show.

"(6) That the deceased, William Lindsteadt, had been employed in and about the defendant's mill for a period of 3 years and upwards prior to May 9, 1914, and for 42¾ days prior to said date was employed by said defendant in said fuel house on the night shift and was so employed on May 8 and 9, 1914; that said deceased was nearly 65 years of age and had been regular in his work during the said 42¾ days.

"(7) That the work and duties of the deceased required him to keep said refuse in said fuel house passing and falling in said conveyor to be carried to the fire room for use under said boilers, and for this purpose he was furnished a hook with which to scrape, pull, or rake said refuse from said pile into the conveyor when the volume of the same had so diminished that it would not fall into said conveyor by its own weight; that the planks over said conveyor near the entrance or door of said fuel house were usually first removed so that said refuse at or near that side of said building would first fall into said conveyor and as further planks were removed approaching further into said pile of refuse, the said refuse would continue to fall into said conveyor of its own weight, so that as the quantity or volume of said refuse diminished in said building the said deceased was required to pull, scrape, or rake said refuse at the sides of said conveyor down into the same so that it would be carried by said conveyor to said fire room and that the said deceased during the night of May 8th and the early morning of May 9th was so engaged in performing the said duties in the fuel house.

"(8) That one Christ Radtke, foreman of the night shift at defendant's mill, went into the hog house at 20 minutes of 3 in the morning of May 9th, and talked

with Lindsteadt about 5 minutes, who, at that time was standing over or near said conveyor raking said refuse into the conveyor, the floor at or near the entrance at that time being clear for a considerable space of said refuse, said refuse being about 8 feet high on one side of said conveyor and 3 feet high on the other side, and that the deceased then stood about 15 feet from the entrance door and apparently was in normal condition and health.

"(9) That at 5 minutes after 3, said Radtke returned to the fuel house with one Patulski, and deceased was not then visible; his body was found by Radtke and Patulski a minute or two afterwards underneath. said refuse with his head about 6 inches from the door and his feet about 6 feet from the door or entrance and about 9 feet from where he stood when Radtke had last seen him alive about 20 minutes previous.

"(10) That the deceased lay on his back with face upwards, his mouth was slightly open, with a chew of tobacco therein, into which sawdust had fallen; there was also sawdust in his nostrils, eyes and ears; there was about 6 inches of said refuse over his face and about 36 inches deep over his feet, the entire body being covered with said refuse; both legs were straight, one heel resting over or near a space between said loose boards, both arms were straight alongside of his body, the hook he had been using in his work lay near him in said refuse; the floor underneath his body was clear and free from sawdust, and he was found to be fully clothed.

"(11) That said refuse at, near, or over the body of said deceased showed no indications of any distubance or any struggle on the part of deceased.

"(12) That there was no injury, wound, cut, abrasion, or external injury of any kind or nature upon the body of deceased.

"(13) That the features, limbs, or body of said deceased were not distorted in any manner whatsoever.

"(14) That an inquest was held at the mill of defendant soon after the body was discovered, and after said inquest said body was removed to undertaking parlors, where at about 6 in the morning an arterial injection of standard embalming fluid was made into

said body immediately after the face of said deceased had been washed and shaved by one Cron, licensed embalmer.

"(15) That the defendant company during the morning of May 9, 1914, made three requests of the claimant and the family of deceased that an autopsy be held for the purpose of determining the cause of death of deceased, which were denied and refused by said claimant and said family, although the said defendant offered to pay the entire expenses of the same.

"(16) That application was made by the president of defendant's company, R. W. Smith, to this board by telephone and by letter during the morning of said May 9, 1914, asking said board to order and direct that an autopsy be held for the purpose of determining the cause of death of said deceased, and that this board advised the said defendant that it had no authority to order an autopsy.

"(17). That the body of said deceased between the hours of 6 o'clock in the morning and noon of the said 9th day of May was examined by three physicians, and that it was the opinion of the medical witnesses that said deceased died from one of the forms of heart disease, and not from strangulation, suffocation, or asphyxiation.

"(18) That the deceased had never complained to the claimant or their family of having any trouble with his heart, and had never been treated therefor as far as his family knew.

"(19) That the average daily wage of said deceased during the 42¾ days he was employed by said defendant in said fuel house was $1.90; that previous to the time deceased was employed in the fuel house he was employed at various work about the mill and plant of defendant company, and from May 10, 1913, to May 10, 1914, deceased had received a total of $540.49, or an average weekly wage of $10.39, during the year prior and immediately preceding his injury.

"(20) That it was agreed by counsel that one cubic yard of refuse in said fuel house would weigh 600 pounds."

### FINDINGS OF LAW.

"From the foregoing we find that the injury or death of deceased arose out of and in the course of his em-

ployment in accordance with section 1 of part 2, Act No. 10, Pub. Acts 1912 (Extra Session) (2 Comp. Laws 1915, § 5431), and that compensation shall be awarded accordingly; that his average daily wage during the 42¾ days deceased was employed in said fuel house was $1.90, and the award of the committee of arbitration is accordingly affirmed."

The evidence taken before the arbitrators is made a part of their return by the Industrial Accident Board. The following additional facts may be gathered from a perusal of the evidence:

The coroner who conducted the inquest testified:

"The face of Mr. Lindsteadt was discolored, pretty much black."

The undertaker who prepared the body for burial gave the following testimony:

"I found the mouth packed with sawdust, not exactly tight, but as much as could be gotten into it. There was some in his throat, eyes, and nostrils. The sawdust in his eyes was between the lid and the eyeball. I did not notice much out of the ordinary as far as any discoloration of the man's face. * * * The effect of embalming fluid when injected in the human body has a tendency to bring it back to a natural color. * * * I could not state what he died from. My idea is that suffocation is what I understood. My common sense would tell me that. * * * I have never studied medicine and wouldn't be able to state what he died from."

Dr. King, sworn on behalf of the defendant, testified:

"I would say that it would be very strong evidence that he did not die of strangulation or asphyxiation. * * * There would be discoloration of the features. * * * There would be no way of finding out whether he died of heart disease without an autopsy. There may be or may not be a struggle from death of heart disease."

Dr. Ramsdell, a witness for the defendant, testified:

"Without an autopsy it would be impossible to determine whether he died· from heart disease or other cause. * * * I have attended persons dying of heart failure at their bedside and the cessation of breathing usually starts immediately. A very slow intake of air, you can hardly recognize it. They will breathe very slow and then (illustrating) out, with just a natural exhaustion. The lungs will suck in a little air, but there will be no decided breathing.

"*Q.* Mouth usually open or closed?

"*A.* It relaxes. When I saw the deceased he had no sawdust in his mouth. A man dying of heart trouble, I doubt whether his breathing would be of sufficient force to draw sawdust into his mouth and thoroughly clog it."

The claimant's daughter testified:

"I examined father's face and body after the body was returned to the house. I looked at him the next morning and his face looked very nice. It was white; but under his arms, he was in the casket, and I pushed back his coat sleeve, and the skin was dark looking, and back of his ears had a purple look."

It is the claim of the appellant that the record contains absolutely no evidence from which the Industrial Accident Board could lawfully draw the inference that the deceased met his death as the result of an injury arising out of and in the course of his employment. Reference is made to the case of *McCoy* v. *Screw Co.,* 180 Mich. 454 (147 N. W. 572, L. R. A. 1916A, 323), where we said:

"The burden of furnishing evidence from which the inference can be legitimately drawn that the injury arose 'out of and in the course of his employment' rests upon the claimant. * * *

"'If an inference favorable to the applicant can only be arrived at by a guess the applicant fails. The same thing happens where two or more inferences equally consistent with the facts arise from them.'"

See, also, *Hills* v. *Blair*, 182 Mich. 20 (148 N. W. 243).

Appellant's contention is stated in the following language:

"In applying the foregoing principles to the facts in the case at bar, the inquiry arises: Do the facts as contained in the board's findings of facts establish by the burden of proof the right of applicant to compensation for the death of deceased? The right of the parties to this appeal is determined by this finding of facts by the Industrial Board. They are binding and conclusive upon the parties in this proceeding for review, unless there is no evidence at all upon which to base them. It is not claimed by the appellant, however, that these findings of fact are not warranted by the evidence. On the contrary, no other findings were possible. It is the contention of the appellant, however, that the board erred in finding these facts sufficient to award compensation to applicant under the act in question, for the reason that they fail to establish by any preponderance of the proof that the death of the deceased arose out of his employment. The board arrived at an erroneous conclusion of law from the facts as found by them."

It seems to be the contention of the appellant that the claimant must establish the fact that the injury, giving rise to the demand, arose out of and in the course of his employment, by a preponderance of the evidence, as in a case at law. Judged by this standard it may perhaps be said that claimant failed to sustain the burden. The act, however, does not cast this burden upon the claimant. It provides, section 12, part 3 (2 Comp. Laws 1915, § 5465):

"The findings of fact made by said Industrial Accident Board acting within its powers, shall, in the absence of fraud, be conclusive, but the Supreme Court shall have power to review questions of law involved in any final decision or determination of said Industrial Accident Board."

In two recent cases we have determined that where

there is any competent evidence to support the finding of the board, this court will not undertake to weigh the evidence or disturb that finding. *Raynor* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665, L. R. A. 1916A, 22); *Bayne* v. *Storage & Cartage Co.*, 181 Mich. 378 (148 N. W. 412).

While this court might reach a different conclusion as to the cause of the death of the claimant's decedent than that reached by the board, we do not think it can be said that there is no evidence in the record justifying that conclusion.

It will be noted that the award provides for the payment of $6.17 per week for a period of 300 weeks. This sum is based upon the earnings of the deceased for the 42¾ days preceding his injury. The record discloses, however, that his average weekly earnings covering the year prior to his death amounted to but $10.39. Under section 11, part 2, this sum should have been made the basis of the award. The finding of the Industrial Accident Board on the question of liability is affirmed, and the case is remanded to that board for the entry of an order in the proper amount, which would be one-half of $10.39 per week for 300 weeks.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and PERSON, JJ., concurred.