MILLER v. ACME WHITE LEAD & COLOR WORKS.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDINGS OF INDUSTRIAL ACCIDENT BOARD—EVIDENCE—SUFFICIENCY.

In proceedings for compensation for the death of an employee under the workmen's compensation act, evidence *held*, by a divided court, sufficient upon which to base the findings of the industrial accident board so as to not warrant the disturbing of their conclusion in favor of claimant.[1]

Certiorari to Industrial Accident Board. Submitted June 11, 1917. (Docket No. 20.) Decided September 27, 1917.

Josephine Miller presented her claim for compensation against the Acme White Lead & Color Works for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Travelers' Insurance Company, insurer, bring certiorari. Affirmed by a divided court.

*Vandeveer & Foster*, for appellants.

*John Kaminski*, for appellee.

OSTRANDER, J. As plaintiff in certiorari says, there is a single point involved in this case, and states the point as "whether or not the testimony was sufficient and legally competent to justify an award to the claimant by the committee on arbitration, and thereafter an affirmance of said award by the industrial accident board."

Claimant's decedent received an injury to his foot June 5, 1916, when a wagon wheel passed over it, or struck it. Such injury as he then received was acci-

[1] On construction and effect of Workmen's Compensation Acts, generally, see notes in L. R. A. 1916A, 23; L. R. A. 1917D, 80.

dental, and the injury arose out of and in the course of his employment. The nature and extent of the injury is, however, uncertain, growing out of the fact, I assume, that because counsel for the employer admitted there was an injury to the foot "as described in the report of the accident, and therefore they need produce no proof on that as there is no question about it," more detailed evidence was not produced. The report was that a truck which he had just finished loading, in turning around, backed over his foot, and the foot was bruised. On the other hand, the claimant, in giving notice to the employer, stated the nature of the injury as follows:

"Whilst loading company's truck, the horses shied, and wheel of truck crushed his right foot. Blood poisoning caused his heart failure."

A physician who saw the injured man June 6th, 7th, and 8th testified that when he first saw him it was evident that first aid had been given to him. He did not examine the injury then. The second time, June 7th, he was complaining of distress in his chest and could not keep quiet, the foot was bothering him and pained him. Then he opened the bandage, and found that the foot "was bruised or crushed more or less." Because he thought his heart was palpitating, and of other symptoms, he gave the patient digitalis and bromide. Among other subjective symptoms was delirium, which the doctor describes as "vague in his ideas and thoughts, and then, if you would call his attention to it, why, he was all right." The record is not clear, but it is understood as meaning that the doctor found high blood pressure and some hardening of the arteries. On June 8th he advised him to go to a hospital, and he went to one, where he died June 16th. The doctor who saw him June 6th, 7th, and 8th never saw him again; except by hearsay knows nothing about the progress of the trouble, the death of the injured

man, or the cause of death. It is upon the testimony of this physician that claimant must rely to support the conclusion of the board that claimant's decedent died as a result of the injury.

Before examining it further, reference is made to the only other medical testimony in the case and the only other testimony which assumes to give details from which a conclusion as to the cause of death can be drawn. It is the testimony of the physician who performed the autopsy upon the direction of the coroner, and who never had seen the patient alive. He testified that the coroner told him to be careful in his examination because there was a history of an injury, and that "he may have died from injury." He found, he says, a large bedsore on the dead man's back, slight abrasion of the right elbow, the right foot discolored and swollen, and some abrasions of the right foot. Internally he found a hardened liver, hypertrophy of the heart and myocarditis, with a lesion of the mitral valve. He reported death from myocarditis. Describing conditions as he found them in greater detail, he said there was a thickening of the mitral valve, with discoloration, the muscle walls of the heart thin, and a fibroid change in the muscle, deposit of little white spots throughout the muscles of the heart, tending to weaken the heart muscle—conditions due to organic trouble. He described myocarditis as follows:

"Myocarditis is a condition of the heart which really means weakened condition of the heart muscle, usually found as a rule in patients past 40; comes on late in life. May be traceable to alcoholism, to hard work, and possibly to syphilis and acute infectious disease, whereby certain organisms are lodged in the heart muscle; sometimes due to valvular disease and hardening of the arteries; sometimes due to a hereditary condition. Sometimes we find families who develop hardening of the arteries very early in life, and that condition very often causes myocarditis. Now, in myocarditis we have an injured heart, a flabby heart; the heart

muscle thins, and a fibrous connective tissue is deposited in the muscles, in place of the muscle tissue, and thereby weakens the heart."

He looked for and found no blood clots, and was unable, he said, to trace the trouble from which the man died to the injury he received. Referring to the injury to the foot, he testified:

"Of course, there would be some change in the foot, because I didn't see him until the 16th, and repair had evidently started to take place, and the foot was in a better condition then than it was when Dr. Jaeger first examined the condition.

"Q. There undoubtedly was some pain to that foot?

"A. Yes.

"Q. There undoubtedly was some fever connected with it?

"A. It was possible.

"Q. Would those conditions have anything to do with weakening the condition of the heart; would it be apt to make it worse?

"A. As I said before, it might aggravate the condition a little."

"Mr. Vandeveer: Would that be great or slight, Doctor?

"A. Oh, I would not say it would be very great.

"Q. Well, it wouldn't need to be very great to kill a person if the heart was in bad shape, would it? Sometimes a slight aggravation there will—

"A. That is possible. A slight change might have produced his death.

"Q. A slight aggravation in this case would have caused that, wouldn't it?

"A. Possibly; yes, sir."

The testimony of this witness was read over to, or was read by, the physician who first examined the injured man, before which time he was told that myocarditis had been given as the cause of the patient's death. He had suggested as a cause of death an embolus, thrombus, blood clot, and suggested no other cause. Upon that subject he gave considerable testimony. Some of it is here set out:

"If an embolus—in other words, I had better put that so you can understand it—an embolus is a clot of blood. For instance, if a clot of matter which may become dislodged from the source of the infection where the primary injury was may have been taken up into the blood stream, pass through the heart and into the coronary arteries, and become lodged in there, and in that way stop the flow of blood by blocking it up. It in itself would form an infection. Of course, there are other things that might cause myocarditis, such as syphilis and tuberculosis, but it is usually from some infected source.

"Q. Was this man suffering from syphilis or tuberculosis?

"A. No, sir; not that I could tell. I have no evidence of that.

"Q. Then the injury that Mr. Miller sustained would cause a thrombus?

"A. A thrombus would be— An embolus is a thrombus that is removed from the original source of infection.

"Q. An embolism is a floating thrombus?

"A. Yes, sir.

"Q. And you want us to understand that that is the reason for this myocarditis?

"A. Might possibly be the reason.

"Q. Would you say it was in this case?

"A. As a matter of fact, that is for the man that made the autopsy. He could tell more about that than I could. I didn't see the heart after the autopsy.

*   *   *

"Q. Doctor, as to whether or not this myocarditis was produced as the result of some floating object in the veins, you cannot say?

"A. I am not positive of that.

"Q. No. Now, if you attempted to say it would simply be a guess upon your part, of course?

"A. It would be a tentative diagnosis; yes, sir.

"Q. Yes. And not being present at the time the inquest was held a guess of that kind would simply be speculative on your part?

"A. Yes; that is speculative.

"Q. And the person who could testify more fully upon that point would be the person who performed the autopsy?

"*A.* Yes, sir; taking into consideration the symptoms he had before.

"*Q.* Yes; if death was caused by the floating of a blood clot to that point, the autopsy would disclose it, would it not?

"*A.* It may not disclose the original source of the original embolus, but would show the effects of the embolus by blocking up the coronary arteries; in other words, there would be no blood supplied to that portion of the heart the embolus got caught in. This is, it caught; it was too large to go up into either one of the coronary arteries, and blocked up the opening, which left the muscles of the heart devoid of blood, and the heart stopped.

"*Q.* Does the drinking of alcoholic liquors ever produce a myocarditis condition?

"*A.* It might produce a chronic myocarditis.

"*Q.* And if it did that would be disclosed in the autopsy, would it not?

"*A.* Most likely.

"*Q.* Now, you say it closes off the supply of blood. The cause of this myocarditis, which might have been produced from several different causes, would have a tendency to lessen the supply of blood that went to the brain, would it not?

"*A.* Not in this case; no, sir. It is only the coronary arteries, the arteries that feed the heart muscles direct, only the muscular structure of the heart, that was involved here.

"*Q.* Now, then, if the patient was suffering from a delirious condition, you would not say that that would be due to the fact that a blood clot had stopped the supply of blood to the brain, would you?

"*A.* It is possible.

"*Q.* Well, my understanding was that in this particular case, as you have testified, that if there was a blood clot at that point, it would not affect the supply of blood to the brain?

"*A.* Well, I am not positive whether there was one blood clot or more than one. There may have been one lodged up in the brain, as far as I can state.

"*Q.* But if the myocarditis was due to drinking, would that produce a delirious condition?

"*A.* Well, that is something I don't know much

about. I never ran into a case of myocarditis that was produced by drinking. I have no knowledge of that fact. I would say, though, that myocarditis produced by drinking would be a chronic condition, and would involve the entire heart structure probably, and not only one section. That would be the way out of that.

"*Q.* You weren't present at the autopsy, doctor?

"*A.* No, sir.

"*Q.* And you don't know what it disclosed?

"*A.* I do not, excepting by hearsay.

"*Q.* And, of course, the autopsy would disclose the conditions that existed there at that time?

"*A.* It ought to; no question about that.

"*Q.* And you would place more reliance upon what the autopsy showed than what your opinion might be as to a time prior to the man's death?

"*A.* I certainly would. The autopsy would be direct evidence of what caused his death. * * *

"*Q.* Doctor, when you treated him on the 7th, that is when he had the pain in his chest?

"*A.* Began to show on the 7th and 8th. I didn't discover that on the 6th.

"*Q.* Is it your view of it now, that that was caused by the embolus?

"*A.* I would consider it—considering the outcome of the case that is my opinion.

"*Q.* This is the only thing you can attribute it to?

"*A.* Yes, sir; considering the circumstances and the symptoms when he was alive.

"*Chairman Reaves:* Supposing a man had myocarditis, and he had an injury of this kind, would that aggravate it? Would the pain and the fever from a condition of this kind aggravate the myocarditis?

"*A.* I should think it certainly would aggravate almost any condition there, if he was not normal.

"*Mr. Healey:* Even if there was no embolus?

"*A.* Even so.

"*Chairman Reaves:* Then it seems to be your opinion that the injury was the proximate cause of death. Is that right?

"*A.* I would state that as my own opinion.

"*Chairman Reaves:* That is all.

"*Mr. Vandeveer:* But, of course, doctor, you have to speculate on a good many things as to that?

"*A.* I say it is my opinion, that is all.

"*Mr. Vandeveer:* Your opinion is of a speculative nature in that respect, is it not?

"*A.* Considering the facts, I should say that would cause it.

"*Chairman Reaves:* And you are basing your opinion on the facts as you know them.

"*A.* On the facts as I know them, and on what I heard from the autopsy.    *    *    *

"*Q.* Doctor, that is the testimony that Dr. Brandt gave before the committee?

"*A.* Yes, sir.

"*Q.* And do your views coincide with his upon that?

"*A.* That is a pretty hard proposition. Some things they do, and in others they do not.

"*Examined by Chairman Reaves:*

"*Q.* Well, would you say, Doctor, after hearing the testimony of Dr. Brandt read to you, and from your own testimony, would you not from your own knowledge, would you say now that the injury was the proximate cause of death?

"*A.* In my opinion it was.    *    *    *    Of course, I might state here that no two physicians agree on everything. ·

"*Examined by Mr. Vandeveer:*

"*Q.* Well, Doctor, the person who performed the autopsy would be in a better position to judge as to the cause of death than the physician who was attending him, would he not?

"*A.* He has got the facts right there, but there was nothing in my examination that would have led me to believe he had myocarditis.

"*Q.* The examination of the organ would disclose that, would it not, doctor?

"*A.* In a way it would. There might be a number of things creep in there I am not acquainted with. Here is one thing Dr. Brandt did not state that an embolism of the coronary arteries would have produced this thing.

"*Q.* The testimony discloses that he found absolutely no blood clot.

"*A.* It isn't necessary to have a blood clot. When a person dies, the right heart is usually filled with the blood clot.

"*Mr. Healey:* He said there was no sign of embolism.

"*A.* Well, myocarditis may be produced; he stated right in there that blood passing from one portion of the foot might possibly lodge in the heart, and cause myocarditis.

"*Mr. Healey:* If it did, it would not be an embolism.

"*A.* It might be.

"*Mr. Vandeveer:* Doctor, could these results that Dr. Brandt discovered be produced in ten days' time?

"*A.* Possibly. If the coronary artery was blocked up it doesn't take long for a fibroid change to take place. The fibroid change often is simply a hardening; the muscular structure is destroyed; in other words, scar tissue gets in there.

"*Mr. Vandeveer:* Well, how about the thickening of the walls, doctor?

"*A.* That would be due to the fibroid condition.

"*Mr. Vandeveer:* You take the position that that could be caused in a period of ten days' time?

"*A.* Oh, not entirely so. A fibroid condition might have existed there for some time previous."

I have set out here the testimony most favorable, if any of it can be said to be favorable, to the contention that death was the result of the injury. That it may have been, is not enough. It is true that Dr. Jaeger affirmatively gives the opinion that the injury was the proximate cause of the death. It is obvious, however, when all of his testimony is considered, that the opinion is an expression of his theory which is not sustained by facts. It may, indeed, be said that all proven facts negative his theory and dispute his opinion.

There is no evidence sustaining the award as made, and it should be set aside.

Stone, Steere, and Brooke, JJ., concurred with Ostrander, J.

Moore, J. I cannot agree with the conclusion reached by Justice Ostrander. Section 12, pt. 3, of the workmen's compensation act (2 Comp. Laws 1915, § 5465), is as follows:

"The findings of fact made by said industrial accident board acting within its powers, shall, in the absence of fraud, be conclusive, but the Supreme Court shall have power to review questions of law involved in any final decision or determination of said industrial accident board." * * *

We have construed this statute repeatedly. Some of the cases are *Rayner* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665, L. R. A. 1916A, 22, Am & Eng. Ann. Cas. 1916A, 386); *Bayne* v. *Cartage Co.*, 181 Mich. 378 (148 N. W. 412); *Reck* v. *Whittlesberger*, 181 Mich. 463 (148 N. W. 247, Am. & Eng. Ann. Cas. 1916C, 771); *Estate of Beckwith* v. *Spooner*, 183 Mich. 323 (149 N. W. 971, Am. & Eng. Ann. Cas, 1916E, 886); *Grove* v. *Paper Co.*, 184 Mich. 449 (151 N. W. 554); *Spooner* v. *Detroit Saturday Night Co.*, 187 Mich. 125 (153 N. W. 657, L. R. A. 1916A, 17); *Papinaw* v. *Railway Co.*, 189 Mich. 441 (155 N. W. 545); *Linsteadt* v. *Lumber Co.*, 190 Mich. 451 (157 N. W. 64).

The record shows that Mr. Miller sustained a bad injury to his foot on June 5, 1916. A physician who attended him June 6th, 7th, and 8th advised him to go to a hospital, which advice he followed, dying there on June 16th. This doctor testified on the hearing that in his opinion the injury was the proximate cause of the death. He was still of that opinion after hearing the testimony offered on the part of the employer.

The vital question was one of fact. There was competent testimony upon which to base the findings of the industrial accident board, and we should not disturb their conclusion.

The judgment is affirmed, with costs to claimant.

KUHN, C. J., and BIRD and FELLOWS, JJ., concurred with MOORE, J.