PAPINAW *v.* GRAND TRUNK RAILWAY CO. OF CANADA.

1. APPEAL AND ERROR—CERTIORARI—MASTER AND SERVANT—WORKMEN'S COMPENSATION—INDUSTRIAL ACCIDENT BOARD—DEATH.

Upon certiorari to review an award of the Industrial Accident Board, its findings of fact, in the absence of fraud, are conclusive.

2. MASTER AND SERVANT—DUTIES—TRESPASSERS — NEGLIGENCE—RAILROADS.

Where decedent was a section foreman, having supervision over switches, and was charged with sending reports to his employer of the time of his crew at regular intervals, and was also required, as part of his duties, to look after the cleaning of the switches in case of a storm, and to attend to this duty at night if necessity required, it could

not be found, as a matter of law, that he was off duty one stormy night in winter when he left home, as he announced, to mail his report, saying that if he was out late he would be working on the switches, and when it was the last night for the mailing of the report and the employee was found killed, about midnight, on the section of tracks of which he was in charge.

3. SAME—TRESPASSERS.

In performing either duty, deceased was not a trespasser on the right of way, which he used as a way to reach the depot of the respondent.

4. SAME—EVIDENCE—BURDEN.

The burden rested on the master to prove that the accident happened while the employee was not performing his duties, upon proofs tending to show that he was

5. SAME.

And his position was distinguishable from those of employees who were not compelled to be at the master's call at any time, but had fixed hours of labor.

Certiorari to the Industrial Accident Board. Submitted October 21, 1915. (Docket No. 11.) Decided December 21, 1915.

Rose Papinaw presented her claim against the Grand Trunk Railway Company of Canada for compensation for the killing of her husband. From an award made, the respondent corporation brings certiorari. Affirmed.

*W. K. Williams* (*Harrison Geer*, of counsel), for appellant.

*J. C. Lehr*, for appellee.

STEERE, J. The husband of applicant, Alfred Papinaw, who had been for several years section foreman for respondent, was killed during the night of January 30, 1914, on its track between his residence and what is called the Tunnel depot of respondent's road in the city of Port Huron. On her application

for compensation under Act No. 10, Pub. Acts 1912 (Extra Session), the Michigan Industrial Accident Board found that his death arose out of and in the course of his employment, and therefore awarded her the full compensation provided in such cases.

The known facts and circumstances relating to Papinaw's death are practically undisputed. Respondent contends that the award was erroneous because it cannot fairly be found as a matter of fact, from any competent evidence in the case, that his death did so arise.

Deceased's section commenced at what is known as Tappan Junction, which was about 1¾ miles west of the Tunnel depot, and extended several miles westerly toward Detroit. He resided with his family near the east end of his section, about 150 feet north of respondent's tracks, on the west side of the Junction road which runs north and south, crossing respondent's tracks a short distance east of Tappan Junction. His daily duties as section foreman required him usually to work upon the track with his section crew from about 7 o'clock in the morning until 5:30 in the evening, the time varying somewhat with the season of the year. It was also his duty to patrol the track Sunday mornings and keep a yard interlocking light burning at night, and relight it in case it went out during the night. Between his section and the Tunnel depot was another section in charge of a different foreman, called the Tunnel freightyard section. In this section were numerous switches, five of which near the Tappan Junction road crossing it was the duty of deceased to look after in case of storm. It was his custom when nothing out of the ordinary arose, and there was no indication of storm, to retire early. He was subject to be called out at any time of night in case of a wreck or to clean the switches in event a storm rendered it necessary. Another of his duties was to keep the time

of his crew and daily enter it on a time book from which he made out their check pay rolls at his home as opportunity arose, and mailed them at the Tunnel depot to respondent's superintendent in Detroit. This was required to be done for the first half of each month in time to reach the Detroit office not later than the morning of the 14th, and for the last half not later than the first day of the ensuing month. The section hands worked by the day with extra pay for overtime, but section foremen were then paid monthly wages of $62.50, which covered whatever services they rendered during the month, and were required to be on call at all times. If they wished to be away beyond call over night or on Sunday they had to secure permission from the roadmaster, while the section hands were at liberty to go and come as they pleased on nights and Sundays.

There was a street, called Griswold, running east and west on the north side of respondent's tracks, but not parallel with them, at a distance of about 4 blocks from the Tunnel depot and about 2½ blocks from respondent's west-bound track at the Junction road near where deceased resided. This was outside of the city limits, similar to a country road. The railroad men, including deceased, who resided near Tappan Junction, were accustomed to use the railroad tracks in going to and returning from the Tunnel depot, it being more convenient and direct than by the street.

Deceased's education was limited and it was hard for him to correctly prepare his pay rolls and reports. He worked at this task the evening before until midnight, and on the afternoon of January 30th, at about half past 3, returned home to complete making them out, which he practically finished about supper time. After supper he signed the paper and his wife addressed the envelopes containing them. He then left home, at about 6:30 o'clock, for the purpose of mailing them at

the Tunnel depot, as was customary and in accordance with his instructions, that they might be received in Detroit the next day. There is no direct evidence of his movements from that time. These papers were mailed that evening at the Tunnel depot and went out on a train which left at 6:55, being received in Detroit the following day. Some time about midnight his remains were found by a switchman on respondent's tracks, badly mutilated and cut to pieces, portions being scattered along and frozen to the track, at a locality variously stated as from about a block and a half east of Tappan Junction to 1,300 feet east of the Junction road. It was a dark, stormy night with a mixture of rain and snow flying and falling. His wife testified that he seldom went to the city at night and never to the tunnel except on the nights when it was his duty to mail his pay rolls and reports; that on leaving this night he commented upon its being dark and stormy, telling her that if he was late she could know that he was out working on the switches.

Between when deceased left home and his remains were discovered, the time of his death is necessarily indefinite. The undertaker who was summoned shortly after their discovery and cared for the remains testified that they were strung along the track 75 or 100 feet, some parts frozen to the rails or ties so that he had difficulty in loosening them; that it was a "cold, nasty, raw night," and he thought from the condition of the body, which he judged had been dead an hour and a half or two hours, that more than one train ran over him; that "one had taken him one way and another brought him back."

In considering this case we start with the well-settled proposition that if the facts proven are capable as a matter of law of sustaining the inferences of fact drawn from them by the Industrial Accident Board, its findings are conclusive, in the absence of fraud, and the

appellate court is not at liberty to interfere with them. Section 12, part 3, of the industrial accident law (Act No. 10, Pub. Acts 1912 [Extra Session]), has been too often and recently so construed by this court to require citation of cases. This is but an application under the statute of the comprehensive and fundamental principle universal in courts of law, that whether there is any competent evidence is for the court to determine, but whether the evidence is sufficient is a question for the jury, the function of the accident board being in that respect those of a jury in actions at law.

This case is readily distinguishable from that line of decisions cited by respondent in which the employee by his contract of hiring was engaged to work during certain hours, and was injured away from his place of employment, while going to or returning from work, or was absent during some intermission for meals, or otherwise, not then upon his employer's business nor subject to his control, at liberty for the time to go where and do what he pleased, free from any claim of the employer upon his services. Here it is shown conclusively that by his contract of hiring deceased was at the time of his death required to be within reach, liable at any time to be called to work upon the track, and in that sense on duty subject to his employer's orders and control. His wife and his fellow foreman, of the section east of his, so testified, as also respondent's supervisors of tracks who said, in part:

"The section foreman is supposed to be on call at any time, in case of trouble with the switches. * * * I gave him (Papinaw) instructions with reference to those switches because he lived near, and was the nearest man to be called. Sharrard lived near the Tunnel depot. Although it was on Sharrard's section I gave Papinaw orders that in case of storm to look after the cleaning of those switches. * * * He was supposed

to be on call in case the tracks got in bad condition of repair so that he could get there without tying up traffic.  *  *  *  If the foreman has not gone to bed before it starts storming he is supposed to go out himself without being called."

Especial and extra duties rested upon deceased that night. He was required to be on call. It was a stormy night, of a kind requiring unusual vigilance as to the switches, and it was imperative that he mail his pay rolls at the Tunnel depot before the evening train left so that they would be in Detroit on the day required. He worked upon those papers until supper time and started after supper for the Tunnel depot to mail them, leaving word with his wife which would keep him in touch with his employer during his absence, as near as possible. It is conceded that he mailed the papers that evening, and they reached their destination on time. It was his duty after mailing them to return and either be at home on call or looking after the switches near by. His last words, so far as there is any proof, show such was his intent, and that he left with this duty on his mind. He was in the habit of retiring early when there was no indication of a storm. Under the terms of his employment it was as much his duty to return to his home, or the switches near there after mailing the papers at the Tunnel depot as it was to go there for that purpose. In going he started along respondent's track, and presumably went that way, as was his custom and that of other employees of respondent, because it was more convenient and the distance to the tunnel shorter than by any other route. He was a section foreman whose special work was to be upon, travel along, and care for his employer's track. He was not a trespasser upon its right of way in any sense which would deny relief under this act, and no question of his negligence is involved in this proceeding. The place and cause

of his death are readily inferable from the facts proven. Respondent's counsel say:

"He was in the act of going to his home at the time he was killed."

If so, under the circumstances of this case, he was performing a duty in the line of his employment out of and in the course of which the accident which caused his death befell him. The accident occurred while he was doing that which a man so employed can reasonably do, and ought to do, and was injured at a place on his employer's premises where, under the proven circumstances, his combined duties made it reasonable that he should be; and there is no proof that he was there for any other purpose than on his return in completing a trip to the Tunnel depot, in the line of his employment, to the place where his employment required him to be on call or at work, and where he would have been during that evening but for the necessity of the trip.

This claim is by a dependent of a workman who was accidentally killed, and whose evidence is therefore not available. In *Grant* v. *Railway Co.*, 1 B. W. C. C. 17, it is said:

"If in such a case facts are proved, the natural and reasonable inference from which is that the accident happened while the deceased was engaged in his employment, I think it falls on the employer, if he disputes the claim, to prove that the contrary was the case."

That an employee, not actually at work, is on duty if required to be at a certain place on call and ready for work, is held in *St. Louis, etc., R. Co.* v. *Welch,* 72 Tex. 298 (10 S. W. 529, 2 L. R. A. 839), where it is said of a member of a railroad bridge gang injured while sleeping in a bunk car provided by his employer:

"The plaintiff at the time of the accident was asleep on a car belonging to the company, provided by it for

that purpose, which was placed upon its side track. He was liable to be called upon at any moment to go out with his gang upon duty upon the road. We think he must be held to have been upon duty at the time he received the injury. That the accident occurred when he was resting from his labors, we think makes no difference. He was subject to the call of the company at the time, and his case differs from that of other servants who engage for certain hours of employment and who are injured during the intervals in which the master has no claim upon his services."

The arbitration committee and Industrial Accident Board were at liberty in determining the facts in this case to draw all rational and natural inferences from the evidentiary circumstances shown. To infer and find that the accident, which resulted in Papinaw's death, arose out of and in the course of his employment, had evidential support, and was neither unnatural nor irrational.

The decision of the Industrial Accident Board is therefore affirmed, with costs to appellee.

BROOKE, C. J., and PERSON, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.