## KENT *v.* BOYNE CITY CHEMICAL CO.

MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—PERSONAL INJURIES—WILFUL VIOLATION OF RULE.

> Evidence, in proceedings for compensation under the workmen's compensation act, *held*, sufficient to sustain the finding of the industrial accident board that deceased was not, at the time he was injured, wilfully and intentionally violating a rule made for his protection.[1]

Certiorari to Industrial Accident Board. Submitted January 22, 1917. (Docket No. 78.) Decided April 9, 1917.

[1] As to what constitutes serious and wilful misconduct within the meaning of the workmen's compensation act, see note in L. R. A. 1916A, 355.

Blanche Kent presented her claim for compensation against the Boyne City Chemical Company for the accidental death of her husband in respondent's employ. From an order awarding compensation, said respondent and the General Accident, Life & Fire Assurance Corporation, Ltd., bring certiorari. Affirmed.

*Kerr & Lacey*, for appellants.

*J. M. Harris*, for appellee.

MOORE, J. The husband of claimant had been in the employ of the Boyne City Chemical Company in various capacities for about a year prior to December 14, 1915. Upon that date, while helping to unload a coal car which was on a slightly elevated track and over a coal bunker adjacent to the furnace room, he received injuries which resulted in his death. His widow made a claim under the employers' liability act (2 How. Stat. [2d Ed.] §§ 3939-4008, 2 Comp. Laws 1915, § 5423 *et seq.*). The record disclosed the following as occurring at the beginning of the hearing:

"*Mr. Gloster:* Q. Mr. Lacey, what is your position in this matter?

"*A.* Your honor, I believe the respondent in this case denies liability on two grounds. One ground that the accident did not arise out of and in the course of the employment, and for the other ground that the employee was injured by reason of his intentional and wilful misconduct."

Considerable testimony was taken. The industrial accident board made the following findings:

"(1) James Kent was employed by the Boyne City. Chemical Company on December 14, 1915, and had been for a year prior thereto.

"(2) That on December 14, said James Kent received a personal injury arising out of and in the course of his employment; died as a result thereof on December 21, 1915.

"(3) That Blanche Kent (Drayton) was wholly dependent upon the deceased for her support at the time of the accident. .

"(4) That the said James Kent was not guilty of intentional and wilful misconduct."

The award of the committee of arbitration which gave claimant $6.72 a week for 300 weeks was affirmed. The case is brought here by certiorari.

The same defense is urged here that was urged before the arbitrators. The head fireman who was over Mr. Kent testified in part as follows:

"*Q.* Just prior to the accident did you see Mr. Kent?
"*A.* Yes, sir.
"*Q.* Where was he?   *   *   *
"*A.* He was in the boiler room.
"*Q.* From what direction did he come?
"*A.* He came from the north door and came from the car, and he cleaned the front end of the car out and got the night engineer to pull the other end of the car down over the bunker hold.
"*Q.* What did he say to you?
"*A.* He came in and says: 'I'll go in and get Ambrose Folsom to help me dump that end of the car. I have it over the bunker hole.' I says: 'James, I don't believe I would go up there and dump that; you have coal enough to last all night.' And he says: 'Well, now, if I dump that end of the car I'll have coal to roll down all night, and I won't have to go up inside of the bunker hole at all.' I said: 'I am going to clean fires in a little while, and I don't believe, if I was you, I would go.' But he got his hammer and went on in the pumproom and got the lantern and Mr. Folsom. He got Mr. Folsom, and they went up there. I will say that it was only about a half hour till I hear Folsom holler.   *   *   *
"*Q.* Did you instruct Mr. Kent to go under this car?
"*A.* No, sir; I did not.
"*Q.* I understand you told him not to do it?
"*A.* I told him, 'If I was you, James, I wouldn't go up and dump the car.' I didn't say anything about going in under it. I said I wouldn't go up and dump

195 Mich.—43.

the car that night. There was plenty of coal if the car hadn't been dumped.

"*Q.* Did you call that to his attention?

"*A.* I told him there was coal enough for the rest of the night.

"*Q.* Was that in the nature of a suggestion, or did you command him not to go up and unload the car?

"*A.* I just felt that I did not want him to go. It was just my opinion that he had enough coal. I didn't think about his being killed."

Mr. Folsom testified in part:

"*Q.* Did you witness the accident?

"*A.* I was the only one that witnessed it. ❋ ❋ ❋ Mr. Kent came in the pumphouse and asked me if I would help him dump a carload of coal. I told him I would; but I had to change my shoes; changed my shoes and went with him as far as the boiler house. He says: 'I will go in and get a hammer.' He came out with a hammer, and we went through the blacksmith shop to the car. When we came to the end of the car I climbed upon the roof of the building with the gas pipe and put it in on the end of the wrench that dumped the pocket, and as I got it fixed he takes the lantern and goes around the side of the car between the building and the car, sets the lantern down outside of the car, and crawls under the car with the hammer. And as he pounded on this place I pulled down with the lever to take all the slack out. He only hit three or four blows when the pocket gave loose, and the dust from the coal blinded so you could see nothing much, and the racket of the coal so you could hear nothing. But as soon as things settled down I could hear him groaning."

The record is clear that Mr. Kent had dumped half of the car earlier in the evening, and at the time of the accident had crawled under that part of the car which had been dumped. He got too far under, and when the door dropped the top of his head was caught between the falling door and the air tank under the car.

Much stress is laid by counsel upon the claim that

Mr. Kent was violating a rule which had been enacted for his safety. There was no claim this was a written or printed rule. Evidence of it was given by Mr. San-, tose, the chief engineer, as follows:

"*Q.* Did you ever see any man at the Chemical Company ever go under a car to trip the car?

"*A.* I have.

"*Q.* As a part of the instructions to the men there at the plant, have you ever told them with reference to the cars?

"*A.* I have told them, as to unloading the cars, that any time they noticed the car was dangerous or thought it was a dangerous car, or in any way working about a car that they had any difficulty with in unloading the car, to report to me, or else leave the car stand until the following morning; that is, if they were on nights. Furthermore, I told them that, if they noticed or thought it was dangerous to be on or around a car, to stay away from it. And more than that, to never go under a car at any time for the purpose of unloading, or to stand on top of those cars, that is, these special B. and O. gondola, to never stand on top of those cars to free the coal, as there was danger of falling through and being covered with coal.

"*Q.* Did you ever say anything of this nature to James Kent?

"*A.* I did.

"*Q.* Do you recall the particular occasion?

"*A.* Why, on the night or two previous to his accident Mr. Kent came to me and stated while in the act of unloading a car the night before Mr. Folsom and himself had a pipe on a wrench above their heads, and in trying to dump the car the pipe slipped and struck him on the head. It was then I made the statement to Mr. Kent in the presence of the firemen to never use a pipe or wrench where it extended over his head and pulling down upon it, for if the wrench slipped, he would be sure to get hurt. I also stated to Mr. Kent on this night that if he had any trouble in dumping the car to not go near it and use coal from the other bunkers, and that I would see that the car was dumped the following day. That is all."

Counsel for claimant insists that, as Mr. Kent is

not here to give his version of what was stated to him, the testimony is incompetent. This same witness testified:

"*By Mr. Urquhart:* You might state if it was necessary sometimes to go under the cars?

"*A.* Well, now, I'll tell you about dumping the cars. When these cars are manufactured the dumping mechanism is so constructed and situated to make the car so that they will dump free, so that one man can dump them. But in constant using of the cars and the condition of the weather the bars become corroded; so when you receive the cars in the yard for dumping, sometimes you find a car that the mechanism works hard. So that is when it is necessary to use other means for assisting in dumping the cars.  *  *  *

"*Mr. Lacey:* Did you ever know of another man going under the car?

"*A.* Yes; I have known of other men going under the car.

"*Q.* What do you mean by that?

"*A.* I have been under cars myself, and other men have been under them.

"*Q.* For what purpose?

"*A.* For the purpose of unlocking these doors.

"*Q.* When have they been under?

"*A.* At different times.

"*Q.* Nighttime and daytime?

"*A.* Nighttime and daytime.

"*Q.* Did you ever send a man under?

"*A.* I never did; I go myself.

"*Q.* Those instructions that were given to Mr. Kent were instructions to all the men?

"*A.* Yes."

Mr. Folsom, who was assisting Mr. Kent when the accident happened, though he had been in the employ of the company a considerable time, and had helped to dump the cars six or eight times, testified that he never heard of the rule. We do not need to decide whether Mr. Santose's statement about the rule was incompetent under the statute. He says the instruction was given to all of the men. Mr. Folsom says he never heard of it.

The head fireman's testimony shows that he knew what Mr. Kent did earlier in the evening, and that he got the hammer and Mr. Folsom to help him unload the car, and while he advised him to wait until morning, he did not say to him he was violating a rule, and his testimony indicates that he did not expect Mr. Kent to be hurt.

In view of the testimony we have quoted, we do not think it can be said that Mr. Kent was wilfully and intentionally violating a rule made for his protection.

The findings of the industrial accident board should be sustained under the cases of *Clem* v. *Motor Co.*, 178 Mich. 340 (144 N. W. 848, L. R. A. 1916A, '352) ; *Rayner* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665, L. R. A. 1916A, 22, Am. & Eng. Ann. Cas. 1916A, 386) ; *Gignac* v. *Studebaker Corporation*, 186 Mich. 574 (152 N. W. 1037) ; *Papinaw* v. *Railway Co.*, 189 Mich. 441 (155 N. W. 545) ; *Bischoff* v. *Foundry Co.*, 190 Mich. 229 (157 N. W. 34) ; and *Beaudry* v. *Watkins*, 191 Mich. 445 (158 N. W. 16, L. R. A. 1916A, 576).

Judgment is affirmed.

KUHN, C. J., and STONE, BIRD, STEERE, and FELLOWS, JJ., concurred. OSTRANDER and BROOKE, JJ., concurred in the result.