## McMINN v. C. KERN BREWING CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDING OF INDUSTRIAL ACCIDENT BOARD.

On certiorari to review an award by the industrial accident board, under the workmen's compensation act, if there was competent testimony to support the finding of the board, the Supreme Court will not review or weigh the evidence.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence that plaintiff's decedent, who was a solicitor and collector for defendant brewing company, had no stated hours of employment, but worked as he pleased, often meeting prospective customers in the evening, when he spent money in their places to entertain them and treat persons present; that he was allowed by defendant to use an automobile furnished by it as he saw fit; that on the day of the accident he met a prospective customer at a ball game, and arranged to take dinner with a few friends at the customer's hotel that evening, when they were to talk business; that on the way to the hotel, while decedent was driving defendant's automobile, he ran into a pile of bricks in the street and was fatally injured; *held*, sufficient to support the finding of the board that the accident arose out of and in the course of decedent's employment.

See notes in L. R. A. 1916A, 23; L. R. A. 1917D, 80.

3. Same.

It was competent for the manager of defendant brewing company to testify to the nature and scope of decedent's employment, and of conversations about the business.

4. Same.

It was also competent for a prospective customer to testify relative to the negotiations and arrangement with decedent for the meeting at the hotel which decedent was on his way to keep at the time the accident occurred.

5. Same—Wilful Misconduct—Question of Fact.

The question of decedent's intentional or wilful misconduct being one of fact, where, from the record as made, the testimony being contradictory, the industrial accident board was unable to find that deceased was guilty of such misconduct as to bar recovery under the act, the finding of the board will be affirmed.

Certiorari to Industrial Accident Board. Submitted June 19. 1918. (Docket No. 98.) Decided July 18, 1918.

Gladys E. McMinn presented her claim for compensation against the C. Kern Brewing Company for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Michigan Workmen's Compensation Mutual Insurance Company, insurer, bring certiorari. Affirmed.

*Beaumont, Smith & Harris,* for appellants.

*John H. Dohrman,* for appellee.

Stone, J. This case is here upon certiorari to the industrial accident board to review its order affirming the award of $10 per week for 300 weeks, made by the committee of arbitration to the claimant or plaintiff, as the widow of Wesley McMinn, deceased.

It is conceded that all parties were under the act.

The accident happened August 16, 1917, and resulted in the death of Mr. McMinn on the night of that day. On August 22, 1917, the respondents filed a report of the accident in which, among other things, it was stated that the occupation of the injured party was,

"Collector, solicitor and chauffeur. Department or branch of work. Collecting and soliciting. * * * How long so employed? Year and a half. * * * Date of accident. Aug. 16, 1917. Hour of accident. 8 p. m. * * * Wages or average earnings per day. $35 per week. Working hours per day. Different hours. Cause and manner of accident: Was driving a Ford touring car, struck a pile of brick and auto overturned. Nature and extent of injury. Death."

After the claim was filed and on October 6, 1917, the insurance company filed a denial of liability on the ground that there was no accident, and if there was one, it did not arise out of, nor in the course of, the deceased's employment. Later, and on November 3, 1917, the insurance company advised the board in writing that it wished to deny liability upon the further ground, that the employee was guilty of wilful and intentional misconduct.

In their petition for the writ of certiorari the respondents allege errors in the findings and order of the board in the following particulars:

"1. By holding, as matter of law, that Wesley McMinn, deceased, sustained an accident which arose out of and in the course of his employment by the C. Kern Brewing Company.

"2. By holding that there is any testimony in the record to sustain a finding that Wesley McMinn, deceased, met his death in an accident which arose out of, and in the course of his employment by the C. Kern Brewing Company.

"3. By holding that the death of Wesley McMinn occurred while he was in the course of his employment by the C. Kern Brewing Company.

"4. By holding that the death of Wesley McMinn

arose out of his employment by the C. Kern Brewing Company.

"5. By holding that Wesley McMinn, deceased, was not injured by reason of his intentional and wilful misconduct.

"6. By holding that the accident which resulted in the death of Wesley McMinn was not due to the deceased's wilful and intentional misconduct.

"7. By holding, as matter of law, that Wesley McMinn, deceased, was not injured by reason of his intentional and wilful misconduct.

"8. By holding, as matter of law, that Gladys E. McMinn is not prevented from recovering compensation from the defendants because Wesley McMinn was injured by reason of his intentional and wilful misconduct."

We cannot better state the views and conclusions of the board, than to quote somewhat at length from its findings. They were in part as follows:

"The first question is: Did the accident arise out of and in the course of the employment of the deceased?

"As to that question, it appears that Mr. McMinn was in the employ of the respondent brewing company as a solicitor and collector. He had no stated hours of employment. He seems to have worked more or less every day, but he worked about when he pleased. He usually went to the office of the brewing company between eight and ten in the morning. He often worked evenings. His duties as solicitor and collector were to solicit business for the brewing company, to get purchasers for the brewing company's beer, to sell all the beer he could, and to collect the money owing to the brewing company. It appears very clearly that in the solicitation of customers and in the placing of the product the respondent employer permitted Mr. McMinn to entertain prospective customers and to spend money in their places by way of treating persons present, etc. He often met the persons he was to do business with in the evening. It seems that he looked up prospective customers wher-

ever he could find them, and he was also advised regarding any such prospective customers by the manager of the brewing company by telephone or otherwise.

"It appears that prior to August 16, 1917, the deceased met Mr. Marvin J. Perrigo, proprietor of the Riverview Hotel, which hotel was located at Ecorse. Mr. McMinn and Mr. Perrigo discussed the proposition of Mr. Perrigo beginning the purchase of beer from the respondent employer, but no definite agreement was reached. It appears that on August 16, 1917, a ball game was arranged for near Ecorse by the members of some sort of a social organization at or near that place. Mr. McMinn and Mr. Perrigo both attended and took part in the ball game. Mr. Perrigo testified that he spoke to Mr. McMinn at that time about purchasing beer from the respondent employer. He said:

"'And on the day of this ball game we were talking about it, in fact I spoke to him about it, and he said, "Well, after the game"—this was before the game started—and he said "after the game, I think some of the boys and myself will be down for dinner." And he says, "I will talk to you then about it."'

"At about eight o'clock that evening, Mr. McMinn left the ball grounds to go to Mr. Perrigo's for the dinner, and to talk about Mr. Perrigo beginning the use of the respondent employer's beer. Mr. McMinn was driving an automobile belonging to the respondent brewing company. The machine was furnished him by his employer, and was kept in a garage at the home of Mr. McMinn. It appears that the work Mr. McMinn was doing required him to use the automobile, and the employer furnished it and permitted him to use it about as he saw fit. The nature of the work of the employee appears to have been such that he was left largely to his own judgment and devices as to how he did his work and when he did it, but he was required to produce results and he evidently did produce them.

"It seems clear that his chief purpose in going to the Perrigo hotel was for the purpose of doing business for his employer with Mr. Perrigo. He seems to have been active and alert in the interests of his employer, and it does not appear to the board that

the fact that he took some friends with him to dinner at Perrigo's is of any importance. It is quite possible that he believed that the taking of the friends to the dinner at the Perrigo hotel and the entertainment of them there might aid him in securing the business of Mr. Perrigo. He was, in our judgment, driving his employer's automobile on his employer's business at the time he met with the accident and was killed.

"When he got quite near to the Perrigo hotel he had occasion to drive past a point where the street upon which he was driving was torn up to some extent. There seems to have been some bricks piled in the street. The car evidently struck the bricks, tipped over and was badly damaged, and he was killed. He was not instantly killed, but died about six hours afterwards at the Ford hospital, to which he had been taken. The board reaches the conclusion that the accident did arise out of and in the course of the employment of the deceased employee.

"See Bradbury's Workmen's Compensation Law—Third Edition (1917), page 480, where the rule is stated as follows:

"'If an employee is conveyed *to and from his work* in a conveyance furnished by the employer, under an express or an implied contract to furnish such conveyance, an injury to an employee while on the journey arises out of the employment.'

"See, also, *Judson* v. *Andrews & Peck Co.*, 1 Conn. Comp. Dec. 54, Bradbury's Workmen's Compensation Law, Third Edition (1917), p. 483; *Beaudry* v. *Watkins*, 191 Mich. 445; *Kunze* v. *Detroit Shade Tree Co.*, 192 Mich. 435; and *Porritt* v. *Railway*, 199 Mich. 200. [See, also, *Malone* v. *Railway*, ante, 136.]

"The other question in the case is as to whether compensation should be refused on the ground that the deceased was guilty of wilful and intentional misconduct. Section 2 of part 2 of the workmen's compensation law (2 Comp. Laws 1915, § 5432) reads:

"'If the employee is injured by reason of his intentional and wilful misconduct, he shall not receive compensation under the provisions of this act.'

"This language has frequently been before the industrial accident board for consideration, and the

question of when an employee is guilty of wilful and intentional misconduct has also been before the Supreme Court in many cases. In none of the cases so far has the Supreme Court held that an employee was guilty of intentional and wilful misconduct. Some of the cases in which the question has been considered by our Supreme Court are the following: *Jendrus* v. *Steel Products Co.*, 178 Mich. 265; *Clem* v. *Motor Co.*, 178 Mich. 340; *Rayner* v. *Furniture Co.*, 180 Mich. 168; *Redfield* v. *Insurance Co.*, 183 Mich. 633; *Gignac* v. *Studebaker Corp.*, 186 Mich. 574; *Beaudry* v. *Watkins*, 191 Mich. 445; *Ramlow* v. *Moon Lake Ice Co.*, 192 Mich. 505; *Kent* (now *Drayton*) v. *Chemical Co.*, 195 Mich. 671; *Oniji* v. *Studebaker Corp.*, 196 Mich. 397; *Cook* v. *Hoertz & Son*, 198 Mich. 129; *Riley* v. *Motor Co.*, 199 Mich. 233. * * *

"There is some disagreement as to how rapidly the deceased was driving his automobile. Walter Lush, a man who was riding in the machine, testified that the machine was being driven about 20 miles per hour and not to exceed 25 miles per hour at the most. He said the bricks in the roadway were the cause of the accident. Portions of an ordinance of the village of Ecorse were offered in evidence. Section 18 of the paper filed with the industrial accident board, which paper purports to be a copy of the ordinance, reads:

"'Automobiles and motorcycles shall be driven at a rate of speed upon said streets not to exceed fifteen (15) miles per hour.'

"Another section provides that any person violating any of the provisions of the ordinance shall upon conviction be punished by a fine of not to exceed $100 and costs. It also provides that in the imposition of the fine, the court may make a further sentence that the offender be imprisoned in the Detroit house of correction until the fine and costs be paid, but not for a greater period than 90 days.

"It is claimed that because Wesley McMinn appears to have been driving more than 15 miles per hour at the time the accident occurred, he was therefore injured and killed 'by reason of his intentional and wilful misconduct.' There is no claim that the deceased wilfully or intentionally intended to injure or kill him-

self. There is no claim that he intended to have this accident occur for the purpose of procuring workmen's compensation, either for himself or his dependents. He was probably driving something more than 15 miles per hour, but it does not appear to the board that he was driving at a greater rate of speed than the rate at which automobiles are usually driven on the streets of a village like Ecorse. * * *

"Presumption of law is doubtless to the effect that Mr. McMinn was driving 15 miles per hour or less. That presumption may possibly be overcome in this case by the testimony of the witnesses who put the rate of speed at 20 or 25 miles per hour. One of the witnesses for the respondents, Arthur F. Martin, in response to a leading question, said he thought the machine was going 25 to 30 miles per hour. He said that when the car struck the bricks it turned over twice, but that it only went 10 or 15 feet after it struck the bricks before it stopped.

"It appears to the board that the witnesses in this case knew very little about how fast the machine was actually going. It was after dark and the headlight was on the machine. It would certainly be pretty difficult for one standing on the street to estimate the rate of speed of a machine coming toward him. The man in the machine thought the machine was going about 20 miles per hour. There is no testimony from him to the effect that he knew anything about judging the rate of speed of a machine. It is possible that the machine was going more than 15 miles per hour, but the board is unable to say that the deceased met his death because of driving an automobile at a rate of speed greater than 15 miles per hour.

"The supreme court of California once had a case considerably like the present case before it. That case is *Fidelity & Deposit Company of Maryland* v. *Industrial Accident Commission of California,* 171 Cal. 728 (154 Pac. 834; L. R. A. 1916D, 903). In that case the industrial accident commission found that the man who was killed was driving at a rate of speed from 35 to 45 miles per hour. The commission awarded compensation, and the supreme court of that State set the award aside. The California statute, however, was considerably different from the Michigan statute.

The California statute provided that compensation should be paid 'where the injury is proximately caused by the employment, either with or without negligence and is not so caused by the intoxication or wilful misconduct of the injured employee.'—Subdivision 3, section 12 (a), California Workmen's Compensation Act, as amended by chapter 607 of the Laws of 1915.

"The California automobile law provided that it was unlawful to drive an automobile at a rate of speed in excess of 30 miles per hour. The deceased in that case was driving at from 35 to 45 miles per hour. The California supreme court peremptorily set aside the award of the commission, saying:

" 'The conclusion is unavoidable that he was guilty of the wilful misconduct contemplated by the law.'

"By a law passed in 1917, effective January 1, 1918, the legislature of the State of California changed the provision above quoted to read that compensation should be paid 'where the injury is proximately caused by the employment, either with or without negligence, and is not caused by the intoxication of the injured employee or is not intentionally self-inflicted.'—Subdivision 3 of section 6, California Workmen's Compensation Law of 1917, which took effect January 1, 1918.

"It does not seem to the board that under the language of the Michigan statute the industrial accident board should follow the decision in the California case. * * * It would be impossible for this board to say that the deceased was in this case killed because he may have been driving more than 15 miles per hour. Possibly he was driving 20 to 25 miles per hour. Did that cause his death? If he had been driving 14 miles or 14½ miles, or at any rate of speed less than 15 miles, would the accident never have happened? Did the fact that he may have been driving 5 miles or 10 miles per hour more rapidly than permitted by the ordinance bring about that accident. It is impossible for the board to say that it did. * * *

"It is quite probable that Mr. McMinn's death would have occurred just the same if he had been driving 14 miles per hour. We cannot say that the accident would not have happened just as it did happen if we were sure that the rate of speed at which the machine

was going was less than 15 miles per hour. The only authorities upon the direct proposition cited in Bradbury's Workmen's Compensation Law, Third Edition (1917), are found on page 563 of that work.

"We do not find that any workmen's compensation law except that of Michigan contains the phrase 'intentional and wilful misconduct.' Many of the acts use the term 'serious and wilful misconduct.' Some of them seem to use the term 'serious misconduct,' and others the term 'wilful misconduct.' The original bill as introduced in the Michigan legislature at the first Extra Session of 1912, contained the phrase 'serious and wilful misconduct.' It was amended in the house by striking out the word 'serious' and inserting in lieu thereof the word 'intentional.' See House Journal, First and Second Extra Sessions 1912, page 74; Senate Journal, First and Second Extra Sessions 1912, pages 99 *et sequitur;* Senate Journal, First and Second Extra Sessions 1912, page 131; House Journal, First and Second Extra Sessions 1912, page 142. It would seem that the legislature deliberately inserted the word 'intentional' in place of the word 'serious,' and it seems to the board that 'intentional and wilful misconduct' ought to mean something more than 'serious and wilful misconduct.' There is nothing in the record to convince the board that the deceased wilfully or intentionally violated the ordinance of the village of Ecorse. He may not have known that he was driving more than 15 miles per hour. He may not have known that such an ordinance existed. Yet, even though he did not, he would probably be presumed to know of the existence of the ordinance. But even if he is presumed to have known of the existence of the ordinance it is not shown that he wilfully or intentionally violated it. On this record the board cannot say that the deceased was guilty of wilful and intentional misconduct which caused his death. In this connection we wish to mention the case of *People* v. *Barnes,* 182 Mich. 179, decided July 25, 1914. In that case the court charged the jury that if at the time Barnes struck the girl who was killed by his automobile, he was operating his car in excess of the speed limit, he was guilty of manslaughter. The Supreme Court held that the

charge of the trial court was erroneous. The court say:

"'From aught that appears in this record, the injury might have occurred just the same as if the respondent had been running 9 miles an hour as it would were he running 11 miles an hour. The charge eliminates from the case all question of whether the respondent, in good faith, believed he was running within the statutory limit, and makes a mistake of judgment on the part of respondent amount to a crime. While it is not the law that, in order. to convict the respondent, it must be made to appear that he knowingly violated the statute because he is bound to know the law, yet there is authority to the effect that he must have been aware, in order to be convicted, that he was doing the unlawful act complained of.'

"It seems to the board that the reasoning in the case of *People* v. *Barnes* is applicable in the case now before us. There is nothing in this record to indicate that this accident might not have happened just as it did happen if the deceased was running his car 14 miles per hour."

The important question for our consideration is, Was there any evidence to support the findings of fact of the board?

Turning to the testimony we find the following: Julius Kern, the manager and representative of the Brewing Company's business at Detroit, testified that he employed Mr. McMinn, who had been in the company's employ for about a year and a half, as collector and solicitor. He testified in part:

"*Q.* In this employment were the hours stated hours of employment, or were they irregular hours of employment?

"*A.* Well, no, I would not say that these hours were regular. He came to work at different hours in the morning and he quit at different hours in the evening.

"*Q.* Would his employment, if he had certain leads to follow, or certain business to solicit, would that take him into — would his duties continue into the evening?

"*A.* At times. * * *

"*Q.* When did you last see Mr. McMinn?

"*A.* I saw him the day before he was killed, I think on a Wednesday. I forget the date.

"*Q.* Did you know of any prospect which Mr. McMinn had to solicit business from, in the village of Ecorse?

"*A.* Why, he mentioned a party out there the day before he was killed, the last day I saw him, that he was going to go out there.

"*Q.* Do you recollect the name of tne party?

"*A.* Mr. Perrigo was his name, was the name of the party he was to see.

"*Q.* Well, now, as to that sort of employment, Mr. Kern, would you, or did you, rather, superintend or command or supervise that employment, or would he be left to his own devices, and his own resources as to obtaining such prospects?

"*A.* Well, I should say it was both ways. He would use his own judgment and he would suggest to me certain people, and at times he would suggest to me where he was going to go, and what he would do that day; if I would consent to it he would do it; if I did not he would not do it. Then sometimes I would suggest certain people that he would call on.

"*Q.* What kind of a conveyance or vehicle did he have; what was it, a Ford machine?

"*A.* A Ford car.

"*Q.* Who owned that machine?

"*A.* Why, the company owned the machine, the Kern Brewing Company. * * *

"*Q.* This automobile which Mr. McMinn used, which you say belonged to the company, state where that was kept nights?

"*A.* Why, it was kept—he kept it generally at his garage at the house. * * *

"*Q.* Likewise, Mr. Kern, is it a fact that Mr. McMinn would be required and did make some collections in the evening occasionally?

"*A.* Yes, he occasionally made collections for the company in the evening.

"*Q.* From customers?

"*A.* Yes. * * *

"*Q. By Chairman Zierleyn:* What were the duties of Mr. — that is, as to hours, the duties of Mr. McMinn, as relates to hours, Mr. Kern?

"*A*. While he didn't have any set hours. He would probably come to work—if he didn't finish his work for the day until six or seven o'clock, or five o'clock, why, he would not come back until the next morning, probably nine or ten in the morning. I never asked him to come back at a certain hour in the morning. He came around when he was ready to do so. I never had any words with him to that effect. He always used his own judgment. I was satisfied he was doing business. I never told him to come back in the morning unless it was for a certain purpose. He generally came around nine o'clock in the morning, sometimes half-past nine. At times at half-past eight in the morning.

"*Q*. Would his duties take him to this Perrigo's place, if he were a prospective customer?

"*A*. Yes, it might take him there any time, I might say any reasonable hour in the afternoon or evening. Any time he would tell me, 'Well, I can't see this certain party until seven or eight o'clock at night, that is when they are generally home.'

"*Q*. If he were there at the time, it would be within the hours of his employment, if he were there in the interest of his employment?

"*A*. He would talk business to them, naturally, I presume he would be.   *   *   *

"*Q*. Do you know that Mr. McMinn had him in contemplation as a customer?

"*A*. He mentioned his name as one of them he was going to call on."

The man Perrigo was examined, and after testifying that he had known Mr. McMinn well, about four years, the following appears:

"*Q*. Do you recall any time prior to the time of Mr. McMinn's death that you had any appointment with him with reference to a business matter relating to his line of business, the brewery business, for instance?

"*A*. Yes. I met Mr. McMinn prior to his death, and Mr. Zimmerer.

"*Q*. Mr. McMinn and Mr. Zimmerer?

"*A*. No, just Mr. McMinn. I was talking with him in regard to changing draft beer.

"*Q.* Where did you meet Mr. McMinn at the time?

"*A.* At the—Zimmerer's place, it was about two weeks prior to this ball game, I think this ball game was partly suggested.

"*Q.* The ball game had been partly arranged?

"*A.* Had been partly arranged for this certain day. I spoke to him in regard to changing beer. He said that he would see what he could do about it."

(Here follows the testimony of this witness quoted in the board's findings.)

"*Q.* Were you at the ball game yourself?

"*A.* I played with them.

"*Q.* Now, at the time you first—or that the matter of changing beer was first spoken of in Mr. Zimmerer's place, did you bring up the matter?

"*A.* I did.

"*Q.* You brought it up?

"*A.* Yes. I approached him on the subject. * * * Now, in coming back from the ball game, he met with his accident, of course?

"*Q.* Were you in the same car?

"*A.* No, I was in my own car. They left ahead of me, and I passed them on the road. I was home, and as I went into the hotel I drove around to the back as usual, and I went into the hotel, and one of the waiters came up to me and said, 'There has been a terrible accident out there.'"

The witness then described the scene of the accident which he at once visited and where he saw McMinn; this was about a half block from his hotel.

On cross-examination the following occurred:

"*Q.* When was the arrangement made relative to your going out there to your hotel for dinner?

"*A.* Right on the ball ground.

"*Q.* On the ball ground?

"*A.* Yes. I knew nothing of their coming out.

"*Q.* You didn't know anything about their coming out there before that time?

"*A.* Not coming out there for dinner.

"*Q.* Sir?

"*A.* Not coming out there for dinner. I knew nothing about it until I came to the ball ground, until I talked with Mr. McMinn."

Being further examined by Chairman Zierleyn, this appears:

"*Q.* When you talked with Mr. McMinn relative to the transfer of your business to him, I did not quite get the answer. When was that?

"*A.* That was about two weeks prior to the ball game.

"*Q.* Had there been an appointment made at the time?

"*A.* Nothing definitely, any more than he would see me about that time. .

"*Q.* When did you next see him again?

"*A.* At the ball game.

"*Q.* What was said at the time relative to it?

"*A.* I spoke to him in regard to it. I asked him what he had done about it, and the reply he made in regard to the price, he said, that 'some of the boys and myself are coming down for supper or dinner after the ball game, and I will have a talk with you then.'

"*Q.* This was that he would come to your place after the ball game?

"*A.* Yes.

"*Q.* That was said at the ball game? 'after which he was killed?'

"*A.* That was said before the ball game started."

*By Mr. Alexander* (one of the arbitrators) :

"*Q.* Did Mr. McMinn have anything personally to do with getting the game up?

"*A.* Nothing more than anybody else.

"*Q.* Then, during the game itself, he did not talk to you about any business, did he?

"*A.* Nothing only just what was said. I spoke to him in regard to it. I didn't know then that he was coming down until he told me he would be down after the game, him and some of the boys."

*By Chairman Zierleyn:*

"*Q.* That he would come down to your place?

"*A.* He would come down to my place and talk it over.

"*Q.* How many of the boys came down at the time this accident happened?

"*A.* Why, I think there were 7 or 8.

"*Q.* Those in your machine, and the ones in his?

"*A.* No, there was one more machine."

There was other testimony of conversations with Mr. McMinn, most of which was objected to as hearsay. What we have quoted is not, we think, subject to that objection. It was competent for the manager of the brewing company to testify to the nature and scope of the employment, and of conversations about the business. And we think that it was also competent for Mr. Perrigo to testify relative to the negotiations, and the arrangement with Mr. McMinn for the meeting at the hotel.

We have repeatedly held that, under the statute, if there was competent evidence to support the finding, we will not review or weigh the evidence. We think there was some evidence in support of these findings.

We are of the opinion that from the evidence which we have quoted, an inference can be drawn that Mr. McMinn, at the time of his accident, was on his way to the place of business of Perrigo, in the course of his employment, and that the accident arose out of, and in the course of his employment. We consider the case a close one upon the facts, but it is not our duty to weigh the evidence.

We shall not add to what has been quoted from the findings and conclusion of the board, upon the subject of intentional and wilful misconduct. We call attention, however, to a lengthy note to the case of *Clem* v. *Motor Co.* (178 Mich. 340), found in L. R. A. 1916A 355. It is there stated that the subject or question is one of fact. It will be noted that in the instant case the board found that the respondents had failed to

show that the deceased was guilty of any intentional or wilful misconduct within the meaning of the workmen's compensation act. That is to say: from the record as made, the board was unable to find that deceased was guilty of such misconduct. Such being the finding upon this question of fact, we think it is our duty to affirm the findings and order of the board; and the same will stand affirmed.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.