ROWE v. LEONARD WAREHOUSES, INC.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—SCOPE OF EMPLOYMENT—INTENTIONAL MISCONDUCT.

Where an employee, whose duty required him frequently to run an elevator, was killed by being struck on the head by the descending elevator while he was looking down the shaft trying to loosen the operating rope which was stuck, it cannot be said that he was not within the scope of his employment or that he was guilty of intentional and wilful misconduct; within the meaning of the workmen's compensation act, although it was not part of his duties to repair the elevator.

Certiorari to Industrial Accident Board. Submitted June 5, 1919. (Docket No. 47.) Decided July 17, 1919.

Sarah Rowe and another presented their claim for compensation against the Leonard Warehouses, Incorporated, for the accidental death of plaintiffs' decedent in defendant's employ. From an order awarding compensation, defendant and the Travelers Insurance Company, insurer, bring certiorari. Affirmed.

*Vandeveer & Foster,* for appellants.

*Washington I. Robinson,* for appellees.

MOORE, J. This is certiorari to review the action of the industrial accident board in awarding compensation of $10 a week to Sarah R. Rowe, the widow, and Marjorie Rowe, the dependent child, of Herman Rowe who was killed while in the employ of the Leonard Warehouses, Inc. The defendant insurance company is contesting the claim, contending that deceased sustained no accident which arose out of and in the course of his employment, and that deceased was guilty of intentional and wilful misconduct. This contention is based upon the claim that it was no part of Mr. Rowe's duty to make repairs upon the elevator and that he was doing so when killed.

There appears in the return of the industrial accident board the following:

"He claimed the rope was tight and did not work right.

"*Q.* That the rope attached to the elevator?

"*A.* Yes, to stop the elevator.

"*Q.* How far were you from him?

"*A.* I was about five or six feet away from him.

"*Q.* And you raised the gate? Was that the gate that let in upon the floor from the elevator? What did you have to do, raise it with your hands?

"*A.* Raise with my hands.  I just kept the door about three or four feet with my hands.

"*Q.* What did he do?

"*A.* Then he looked down to see what is the matter with that rope.

"*Q.* Did you see the elevator coming?

"*A.* Before I turned around, before I just turned around the elevator was then about two inches before me.  It was coming down right on him.

"The testimony shows that the deceased was using the elevator.  Said witness again testified:

"*Q.* If the rope was fastened, would he have to unfasten it at all?

"*A.* No, he used the elevator five or six times.

"*Q.* That day?

"*A.* Yes.  He was up and down about five or six times.  He claimed that the rope must be caught and did not work right; can't start the elevator.

"*Q.* So then he went to unfasten or unhitch the rope, I suppose?

"*A.* I did not ask him.  He did not tell me.  He just tell me to raise up the gate, hold the gate.

"And again:

"After the foreman went into the office, Mr. Rowe walked over to the elevator?

"*A.* Yes.  He was standing about a couple of minutes.  Then he says, 'I can't see what is the matter with the rope.'

"*Q.* You and he walked over?

"*A.* I went right with him and he told me to raise up the gate.

"*Q.* After he raised up the gate did he raise the guard up?

"*A.* The guard up two and a half or two feet from the ground.

"*Q.* Then he laid down on his stomach with his head to the elevator shaft?

"*A.* And tried to get the rope loose to see what is the matter with it.  I don't know what he done.

"The testimony also shows that it was the usual thing for the deceased to use the elevator.  There cannot be any doubt in this matter but that the accident did arise out of and in the course of the employment, and that it killed this man, and that he was not guilty of wilful and intentional misconduct."

It may be well to quote some of the testimony given by the foreman who had been in the defendant's employ several years and who testified Mr. Rowe had been his helper for more than a year.

"*Q.* Again, what floor was it that his body was on?

"*A.* It was on the first floor in the warehouse.

"*Q.* Did his duties take him up on that elevator?

"*A.* Oh, yes. We were working at the present time on that floor about twenty feet from the elevator.

"*Q.* What disposition had Mr. Rowe shown before the accident?

"*A.* Good. He was in high spirits that morning. We were joking all the morning. We had both bought a liberty bond; joking about it in the morning. * * *

"*Q.* What type man was Mr. Rowe?

"*A.* Finest in the land, fine.

"*Q.* As to health?

"*Mr. Vandeveer:* I object.

"*A.* As far as his health he never complained. That I cannot say.

"*Q.* What age man was he?

"*A.* I think he told me he was 53."

Counsel cite in support of their contention *Bischoff* v. *Foundry Co.,* 190 Mich. 229; *Lobuzek* v. *Foundry Co.,* 194 Mich. 533, and claim they are controlling because of the following testimony of the foreman:

"*Q.* Just before this accident happened you were in the rear of the building rolling rugs, with Mr. Rowe and Mr. Rosenberg, were you not?

"*A.* Before the accident, yes.

"*Q.* You had occasion to leave those two men there and went into the front office to get some tags?

"*A.* No, some checking.

"*Q.* Checking?

"*A.* Yes. That is to tag the rugs on and number them."

He testified the elevator had been running smoothly, apparently in good working order and nothing out of repair or anything that needed adjustment.

"You had not given either of the men any orders to use the elevator while you had left the room?

"*A.* No, sir.

"*Q.* Had you?

"*A.* No, sir.

"*Q.* Occasionally, when adjustments were needed upon the elevator, you would 'always notify the Otis people?

"*A.* Yes, the Otis people.

"*Q.* And they would come and repair it?

"*A.* Yes.

"*Q.* You had never requested Mr. Rowe to do that?

"*A.* No.

"*Q.* And it was not a part of his duties?

"*A.* No, not to repair.

"*Q.* Make repairs or adjustments?

"*A.* No.

"*Q.* Or to test it in any way?

"*A.* No.

"*Q.* Mr. Rowe's duties were those of a helper in handling furniture in the store room?

"*A.* Yes.

"*Q.* That is the trucking and the carting of it?

"*A.* Well, not cartage, no.

"*Q.* I mean handling it by truck?

"*A.* Oh, yes.

"*Q.* But not going out on any of the wagons?

"*A.* Not outside, no.

"*Q.* You had an electrician there?

"*A.* Yes.

"*Q.* And the electrician took care of the motor?

"*A.* Yes.

"*Q.* And the oiling, such incidents as that as to the operation of the elevator?

"*A.* Yes.

"*Q.* And you never knew Mr. Rowe to make any repairs or adjustments upon the elevator?

"*A.* No.

"*Q.* And it was not any part of his duty to do it?

"*A.* No.

"*Q.* And you never requested him to do it?

"*A.* No, never asked him to do anything like that.

"*Q.* He was not engaged as a mechanic?

"*A.* No.

"*Q.* If he attempted to do that he would be doing something that was not within the scope of his employment?

"*A.* If he did.

"*Q.* I say if he did.

"*A.* Yes.

"*Q.* He would not be doing anything within the scope of his employment?

"*A.* No.

"*Q.* Mr. Rowe's employment was to handle the furniture and to move it from one point to another in the warehouse and packing and things of that character?

"*A.* Of course, he would operate the elevator, up and down.

"*Q.* In moving furniture up and down?

"*A.* Yes.

"*Q.* But what I am speaking of is to make repairs and things of that kind?

"*A.* Oh, no.

"*Q.* That was something that the electrician of the Otis elevator people attended to?

"*A.* Yes."

It is not clear as to how much of this testimony was competent as Mr. Rowe could not give his version of the situation. See *Zoladtz* v. *Detroit Auto Specialty Co.*, *ante*, 349, and *Hanna* v. *Michigan Steel Castings Co.*, 204 Mich. 139. But if we regard the testimony as competent it does not bring the instant case within the cases cited by counsel for appellant.

The foreman testified that four minutes before the accident the elevator was running well. The evidence establishes beyond a doubt that it was part of the duty of the deceased to frequently run the elevator. The record does not show that it was in such a condition as to require the services of an electrician or that a report be made to the Otis elevator people. The most that can be said of it is that the rope which operated it stuck. Suppose the gate or a door to an

elevator stuck, could not the operator try to make it open? It would not tend to efficiency on the part of the employee if when so simple a thing as happened occurred, that he might not investigate.

The question involved is not new in this court. Some of the cases are *Jendrus* v. *Detroit Steel Products Co.,* 178 Mich. 265 (L. R. A. 1916A, 381, Ann. Cas. 1915D, 476) ; *Clem* v. *Chalmers Motor Co.,* 178 Mich. 340 (L. R. A. 1916A, 352) ; *Rayner* v. *Sligh Furniture Co.,* 180 Mich. 168 (L. R. A. 1916A, 22, Ann. Cas. 1916A, 386) ; *Redfield* v. *Insurance Co.,* 183 Mich. 633; *Gignac* v. *Studebaker Corporation,* 186 Mich. 574; *Beaudry* v. *Watkins,* 191 Mich. 445 (L. R. A. 1916F, 576) ; *Ramlow* v. *Moon Lake Ice Co.,* 192 Mich. 505 (L. R. A. 1916F, 955) ; *Poniatowski* v. *Stickley Bros. Co.,* 194 Mich. 294; *Kent* v. *Boyne City Chemical Co.,* 195 Mich. 671; *Oniji* v. *Studebaker Corporation,* 196 Mich. 397; *Cook* v. *Charles Hoertz & Son,* 198 Mich. 129; *Riley* v. *Mason Motor Co.,* 199 Mich. 233; *McMinn* v. *C. Kern Brewing Co.,* 202 Mich. 414.

The award is affirmed, with costs to the claimants.

BIRD, C. J., and OSTRANDER, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.